IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| Respondent, § | |
| § | |
| V. § | CRIMINAL ACTION NO. H-10-788-3 |
| § | CIVIL ACTION NO. H-16-1582 |
| RONALD DWAYNE THOMAS, § | |
| § | |
| Movant. § | |

## **MEMORANDUM AND RECOMMENDATION**

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Defendant/Movant Ronald Dwayne Thomas's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 275)[1], the Government's Motion to Dismiss (Document No. 288), Movant's Response to the Government's Motion to Dismiss (Document No. 292), Movant's Motion to Amend § 2255 Motion with *Mathis v. United States*, 136 S.Ct. 2243 (2016) claim (Document No. 293), and Movant's Motion to Stay (Document No. 294). After reviewing Movant's § 2255 Motion to Vacate, Set Aside or Correct Sentence, Motion to Amend § 2255 Motion, Motion to Stay, the Government's Motion to Dismiss, the record of the proceedings in the underlying criminal case, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Movant Ronald Dwayne Thomas's § 2255 Motion to Vacate, Set Aside, or Correct Sentence (Document No. 275), Motion to Amend § 2255 Motion (Document No. 293), and Motion to Stay (Document No. 294 be DENIED, that the United States's Motion to Dismiss (Document No. 288)

---

[1] Ronald Dwayne Thomas's Motion to Vacate, Set Aside, or Correct Sentence can be found at Document No. 1 in Civil Action 4:16-1582 and at Document No. 275 in Criminal Action No. 4: 10-788-3. All further references to documents will refer to their numbering in Criminal Action No. 4:10-788-3.

be GRANTED, and that this § 2255 proceeding be DISMISSED with prejudice.

## I.     Introduction and Procedural History

Movant Ronald Dwayne Thomas ("Thomas"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. § 2255. This is Thomas's first motion pursuant to § 2255.

On November 10, 2010, Thomas along with Michael Wilbourn, Michael J. Washington, and Kenneth R. Randle were charged in a two count Indictment. All were charged with bank robbery in violation of 18 U.S.C. § 2113(a) and (d) (Count One), and Thomas, Michael Wilbourn, and Michael J. Washington were charged with possession of firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(Count Two). (Document No. 27). On April 1, 2011, Thomas pleaded guilty, without a written Plea Agreement to Counts One and Two. (Document No. 70, Transcript of Rearraignment, Document No. 604). The transcript of his Rearraignment hearing confirms that Thomas understood the charges against him, the rights he would give up if he pleaded guilty, the possible penalties, and the sentencing process. (Document No. 173, pp. 11-24). The record further reflects that the Government summarized the facts that it was prepared to prove if the case proceeded to trial. (Document No. 173, p. 25-32). The Prosecutor stated:

> First, the Government would be prepared to prove if the case went to trial, that the young man to my left in the orange pants and white shirt, is the same Michael Wilbourn as is named in the Indictment. And the young man in the orange pants and orange shirt is the same Ronald Thomas named in the Indictment. And the young man in the green suit is the same Kenneth Randle as named in the Indictment.
>
> All the Government's evidence, documents, witness statements and defendant statements would be admissible at trial without objection.

But more specifically, that on Thursday, October 14th of 2010, at about 9:45 a.m., the First National Bank located in the 5800 block of South Gessner, was robbed by four young black males. I would tell the Court that the First National Bank that was robbed is, in fact, federally insured by the Federal Deposit Insurance Corporation.

The bank robbers were later identified as Mr. Randle, Mr. Wilbourn, Mr. Washington and Mr. Thomas.

Of the four individuals, Mr. Wilbourn, Mr. Washington and Mr. Thomas entered the bank and there were three bank employees that they directly addressed. Mr. Wilbourn, Mr. Washington and Mr. Thomas were all each armed with a pistol. Mr. Thomas approached one of the bank employees, Ms. Solis, who was standing in the lobby. He pointed a pistol at her and ordered her to get to the ground. Mr. Wilbourn approached another bank employee, Ms. Sanghui–the spelling is S-a-n-g-h-u-i- who was seated at her desk in the lobby, pointed a pistol at her and instructed her to get to the ground.

Mr. Washington pointed a pistol at another employee, Ms. Watkins, who was working behind the teller counter, instructed her to open the door which leads from the lobby area to the vault room, as well as to the area behind the teller counter.

Mr. Wilbourn, Washington and Thomas ordered the employees to the vault room, where they demanded money. Each of the three threatened to shoot the employees if they did not hurry up and show them where the money was.

Mr. Thomas assaulted Ms. Watkins by grabbing her hair. Mr. Wilbourn assaulted Ms. Watkins by grabbing her hair and striking her face.

Ms. Solis, fearing for her life, informed Mr. Wilbourn, Washington and Thomas that she had the money in her teller drawer. Ms. Solis gave her teller drawer key to Ms. Watkins, and Ms. Watkins and Mr. Thomas retrieved money from Ms. Solis' teller drawer.

Mr. Washington approached Ms. Solis, again pointing a pistol at her, and demanded to know where the rest of the money was. Ms. Watkins, fearing for her life, opened the vault, at which time Mr. Washington removed some money from the vault while Mr. Wilbourn and Mr. Thomas maintained control of the bank employees.

After obtaining the money prior and to leaving the bank, Mr. Wilbourn and Mr. Thomas and Mr. Washington all threatened to shoot the bank employees if they moved. They left the bank, got in an older Cadillac and drove away. Part of the money had a tracking device in it. So law enforcement authorities were tracking the movement of the money, which of course was in the car–was tracking the movement of the money.

Another police officer heard the radio traffic about the bank robbery, that the tracking device was in the vicinity of where he was, and the car was believed to be an older Cadillac with four young black males in it. He saw an older Cadillac with four young black males in it in the vicinity where the tracking device had been radioed, this location which he heard over the radio. He turned around and got behind this Cadillac, which immediately then took off. And he followed—basically, the car sped away. He followed the car to an apartment complex located in the 9800 block of United Street in Houston. Upon pulling into the apartment complex, all four of the occupants jumped out and ran away.

This officer pursued the subjects as best he could. He lost sight of the subjects, but was informed by a witness at the apartment complex that Mr. Randle, or later identified as Mr. Randle, had jumped over a fence and was in a field adjacent to the apartment complex. This officer entered the field and found Mr. Randle hiding there, where he took him into custody, and Mr. Randle was identified as the person who had been one of the persons who had ran away from the Cadillac when it pulled into the apartment complex.

Other HPD officers arrived at the scene. They surrounded the apartment complex, were notified by a maintenance official at the apartment complex that there was a window recently broken out of an apartment, had just been broken out of an apartment.

The officers arrived at the apartment and entered the apartment, which was a two story apartment. Upon entering the apartment, the occupants of the apartment ran down the stairs from the second floor into the custody of the HPD officers. The occupants informed the officers that there were two subjects upstairs in the residence who had broken into their residence.

Mr. Wilbourn and Mr. Washington began to walk down the stairs where they were met by the HPD officers. Then they ran back

upstairs trying to avoid the officers. The officers followed and Mr. Wilbourn and Mr. Washington were taken into custody in the upstairs apartments where they had broken into.

The occupants of the residence advised the officers that Mr. Wilbourn and Mr. Washington had broke into their residence and made them remain in the upstairs bedroom while Mr. Wilbourn and Mr. Washington hid from law enforcement as best they could.

Mr. Thomas, he was found hiding in a storage closet within the same apartment complex and the officers found in his pockets some of the reported– money that had been reported as being stolen from the bank. Also found nearby him was a bag containing some of the money that had the tracking device in it right there where Mr. Thomas was found.

Mr. Wilbourn, Washington and Thomas were transported back to the bank, where they were separately viewed by bank employees. Mr. Wilbourn and Mr. Washington and Mr. Thomas were positively identified as being the three individuals who robbed the bank earlier that day.

Each of the individuals, Mr. Randle, Mr. Thomas, Mr. Wilbourn, and Mr. Washington, were all taken back to HPD offices, where [they] were all interviewed that day. With respect to Mr. Randle, he was read his *Miranda* warnings, he waived his warnings and agreed to be interviewed. During the course of the interview, Mr. Randle confessed to being the get-away driver, during the bank robbery, as well as one of the planners of the bank robbery along with Mr. Thomas, Wilbourn and Washington. Mr. Randle said he was to receive a portion of the bank robbery proceeds for being the driver.

That same afternoon, Mr. Thomas was interviewed and likewise confessed.

On the same afternoon, Mr. Washington was interviewed. He again was given his warnings. He waived his rights and his warnings and agreed to be interviewed.

During the interview, he also confessed of participating in and planning and carrying out the bank robbery, along with Mr. Randle and Mr. Wilbourn and Mr. Thomas. Mr. Washington confessed to being in possession of a firearm during the commission of the bank

robbery, and again, he also stated that, of course, he was going to receive a portion of the bank robbery proceeds.

The same afternoon about the same time, Mr. Wilbourn was interviewed by the HPD officers. He was read his statutory warnings, which he waived, and agreed to apeak to the officers. He again, as the others confessed in participating in the planning, the execution of the bank robbery with his co-defendants, he also confessed to being in possession of a firearm during the commission of the bank robbery. And Mr. Wilbourn confessed to physically assaulting one of the bank employees during the commission of the bank robbery.

The bank reported a loss of the officers of $40,312 and change, of which $35,577 was recovered at various locations. For instance, about $19,750 was recovered in the apartment where the two defendants had fled and gone upstairs before they were caught by the officers.

Another $11,261 was found in the Cadillac where the defendants had fled from when they pulled into the apartment complex.

About $210 was found on Mr. Thomas himself and another $1,093 was found in a bag basically next to where Mr. Thomas was found and that was the money with the tracking device in it.

Inside the Cadillac were two of the pistols used during the bank robbery, both being, I believe, loaded 9 millimeter semi-automatic pistols, along with other items that were recovered, some of the clothing, and as I already mentioned, some of the money taken from the bank robbery.

Also recovered was the third pistol used in the bank robbery near or in the bag that was found near Mr. Thomas. Also, I believe, a 9 millimeter semi-automatic pistol.

There is money that has never been recovered, roughly I think $4800, [I] have no idea where it was. This was a short period of time from 9:00 bank robbery until everything was recovered. The defendants were arrested within literally a few hours. What happened to that other $4800, frankly, we don't know. It's somewhere. Somebody has it, but we don't know where it is.

That's what the Government would be prepared to prove if the case went to trial, Your Honor. (Document No. 173, pp. 25-32).

In response, Thomas confirmed the accuracy of the summary and his role in the offense. (Document No. 173, p. 33). Prior to sentencing, a PSR was prepared to which Thomas filed written objections. (Document Nos. 82, 98, 100).[2] Thomas had a base offense level of 20. Because property of a financial institution was taken under U.S.S.G. § 2B3.1(b)(1), Thomas's offense level was increased by two levels. Also because a victim sustained bodily injury, under U.S.S.G. § 2B3.1(b)(3)(A), the offense level was increased by two levels. In addition, because the bank employees were abducted, i.e, physically restrained and being forced, at gunpoint, to move from the lobby area to the vault area of the bank, Thomas's offense level was increase by four levels pursuant to U.S.S.G. § 2B3.1(b)(4)(B). The intended loss to the bank was $40,213.50, which resulted in a one level increase to the offense level pursuant to U.S.S.G. § 2B3.1(b)(7)(B). Because Thomas accepted responsibility for his role in the offense, and did so timely, his offense level was reduced by three levels pursuant to U.S.S.G. § 3E1.1(a) and (b). With adjusted offense level of 26, and with a criminal history of category V, Thomas had an advisory sentencing guideline range of 110 to 137 months. Count two carried a consecutive term of imprisonment of seven years. The record shows that Thomas's objections to the PSR were overruled, following a two day sentencing hearing, which included testimony of an FBI agent, and the bank tellers. (Transcript of July 7, 2011, Sentencing Hearing (Document No. 164) and Transcript of July 29, 2011, Sentencing Hearing, (Document No.

---

[2] Thomas objected to PSR ¶ 7. Thomas argued that he did not intentionally aim a pistol at the head of any teller. He also objected to PSR ¶ 8. Thomas maintained that he never pulled any employees' hair or threatened to shoot anyone. He objected to the abduction enhancement and the injury enhancement. Thomas further objected to the loss amount. Thomas also denied involvement in any gang. Based on Thomas's calculation, his adjusted offense level should be 20, and based on this calculation, his guideline sentencing range should be 63 to 78 months.

171)). On July 29, 2011, Thomas was sentenced to a term of imprisonment of 137 months as to Count one, to be followed by a consecutive term of 84 months as to Count two, for a total term of 221 months' imprisonment, to be followed by a four year term of supervised release. Thomas was also ordered to pay $4,735 in restitution. In imposing sentence, the Court stated:

> Mr. Ronald D. Thomas is before the Court this afternoon. He has pled guilty to Aiding and Abetting Armed Bank Robbery and Aiding and Abetting the Brandishing of a Firearm During a Crime of Violence. He planned with his co-defendants to execute the robbery of the First National Bank, a financial institution, in Houston, Texas. He and his two co-defendants were armed with firearms during the commission of the robbery, in which they stole approximately $40,213.50 from the bank. During the robbery, Mr. Thomas pointed a gun at an employee and ordered her to the ground. Additionally, he grabbed an employee by her hair and threatened to shoot the employees if they moved. The instant offense is his sixth criminal conviction. He has three pending charges which he committed two months prior to the instant federal offense.
>
> The Court and the probation officer have identified factors which might suggest a sentence outside the advisory Guideline range. But I believe that the offense conduct is best accounted for by imposing a sentence at the high end of the applicable Guideline range, and that such a sentence is sufficient, but not greater than necessary to serve as a deterrent, provide just punishment and promote respect for the law, as outlined in 18 United States Code Section 3553(a). (Transcript of Sentencing Hearing, Document No. 171, p. 113-114).

Judgment was entered on August 8, 2011. (Document No. 135). Thomas appealed the two-level enhancement for bodily injury and four level enhancement for abduction. Unpersuaded by Thomas's arguments, the Fifth Circuit Court of Appeals affirmed his conviction on December 10, 2012. (Document No. 219). Thomas did not file a petition for writ of certiorari with the United States Supreme Court. His conviction became final when the deadline for requesting certiorari review expired 90 days later or on March 12, 2013. On May 31, 2016, Thomas, relying on the

Supreme Court's decisions in *Johnson v. United States*, 135 S. Ct. 2551 (2015), and *Welch v. United States*, 136 S. Ct. 1257 (2016), filed his § 2255 Motion to Vacate, Set Aside or Correct Sentence. In response, the Government argues that *Johnson* does not apply to Thomas's conviction and/or sentence, therefore, rendering his § 2255 motion untimely. On or about May 2, 2017, Thomas filed a Motion to Stay or Hold his § 2255 Motion until the Supreme Court decides *Sessions v. Dimaya*, 137 S. Ct. 31 (2016). (Document No. 294). Additionally, Thomas filed a Motion to Amend his § 2255 Motion, adding claims based on the Supreme Court decision in *Mathis v. United States*, 136 S.Ct. 2243 (2016).

**II. Discussion**

A. The Supreme Court's Decision in *Johnson* Does Not Apply to Thomas

In *Johnson*, the Supreme Court found that "an increased sentence under the residual clause of the Armed Career Criminal Act ("ACCA") violates the Constitution's guarantee of due process." *Johnson*, 135 S. Ct. at 2563. The holding in *Johnson* was made retroactive to cases on collateral review in *Welch*. *Welch*, 136 S. Ct. at 1265 ("*Johnson* is thus a substantive decision and has retroactive effect...on collateral review."). Since then, various other statutory provisions, including the "crime of violence" definition in 8 U.S.C. § 16(b), other provisions of 18 U.S.C. § 924, including § 924(c), as well as provisions of the United States Sentencing Guidelines, have been challenged on the same due process grounds as that at issue in *Johnson*.

Here, as argued by the Government, *Johnson* does not directly or indirectly apply to Thomas's conviction and/or sentence. That is because Thomas was sentenced pursuant to 18 U.S.C. § 924(c)—not the ACCA, to wit, § 924(e). To the extent that Thomas argues that his convictions for bank robbery under 28 U.S.C. § 2113(b) and (d), and sentence under § 924(c) should be

invalidated for the same reasons articulated in *Johnson*, such an argument is currently foreclosed by Fifth Circuit precedent, which has rejected *Johnson* challenges to the "crime of violence" definition in 18 U.S.C. § 16(b), a substantially parallel statute. See *United States v. Gonzalez-Longoria*, 831 F.3d 670, 672 (5th Cir. 2016) (en banc) (pet. cert. filed Sept. 29, 2016)(No. 16-6259); but see: *Sessions v. Dimaya*, 137 S. Ct. 31 (2016) (granting certiorari review to decide whether section 16(b), as incorporated into the Immigration and Nationality Act's provision governing alien's removal from the United States, is unconstitutionally vague). The Fifth Circuit has extended that precedent to the crime of violence definition in § 924(c)(3)(B), which is at issue here. *See United States v. Davis*, 677 Fed. Appx. 933, 2017 WL 436037 at *5 (5th Cir. Jan. 31, 2017) (pet. cert. filed Apr. 14, 2017, and May 1, 2017) (Nos. 16-8777, 16-8997) ("We join several other circuits in concluding that *Johnson* does not invalidate §924(c)(3)(B)."); *United States v. Miller*, 681 Fed. Appx. 381, 2017 WL 1018335 at *2 (5th Cir. Mar. 14, 2017)("We agree with a later non-precedential opinion that because Section 16(b) and Section 924(c)(3)(B) are materially identical, there is no merit in arguing that Section 924(c)(3)(B) was rendered unconstitutional by *Johnson*."); *United States v. Jones*, 854 F.3d 737, 740 (5th Cir. 2017)(pet. cert. filed July 17, 2017)(No. 17-5285)("The definition of "crime of violence" found in § 16(b) is identical to the definition found in § 924(c)(3)(B); therefore, the definition of 'crime of violence' under § 924(c)(3)(B) is not unconstitutionally vague."); *In Re Fields*, 826 F.3d 785, 787(5th Cir. 2016)("…the Supreme Court has not taken a position on whether *Johnson* applies to section 924(c)(3)(B)."); *United States v. Bell*, 680 Fed. Appx. 329, 2017 WL 991056 at *1 (5th Cir. Mar. 13, 2017)("We agree with a later non-precedential opinion that because Section 16(b) and Section 924(c)(3)(B) are materially identical, there is no merit in arguing that Section 924(c)(3)(B) was rendered unconstitutional by *Johnson*."); *United States v. Garcia*, 857 F.3d

708, 711 (5th Cir. 2017)("However, our court subsequently held that 18 U.S.C. § 16(b), which contains wording almost identical to that of § 924(c)(3)(B), is not unconstitutionally vague."). This court follows Fifth Circuit precedent unless and until that precedent is altered by the decisions of the Supreme Court in *Sessions*.[3] As such, the pending decision in *Sessions* provides no justification to stay Thomas's § 2255 motion. Therefore, Thomas's Motion to Stay (Document No. 294) should be denied.

B. *Mathis* claims

Thomas has moved to supplement his § 2255 motion to raise a claim based on the U.S. Supreme Court's decision in *Mathis*. 136 S. Ct. 2243. According to Thomas, 18 U.S.C. § 2113(a), (d), cannot be considered a crime of violence. Thomas's reliance on *Mathis* is misplaced. In *Mathis*, the Supreme Court held that, for the purpose of determining whether an offense qualifies as an ACCA predicate, the court takes a modified categorical approach, looking to the statutory elements of the offense rather than to the means of commission. *Mathis*, 136 S.Ct. 2257. The Supreme Court noted in *Mathis* that is was not announcing a new rule and that its decision was dictated by decades of prior precedent. *Id.* The Fifth Circuit has held that *Mathis* did not announce a new rule of constitutional law that has been made retroactive to cases on collateral review. *see In re Lott*, 838 F.3d 522, 523(5th Cir. 2016)(denying authorization to file a successive application under 28 U.S.C.

---

[3] Moreover, to the extent that Thomas's argues the bank robbery is not a crime of violence in light of *Johnson*, his claim fails. The Fifth Circuit Court of Appeals has held in post-*Johnson* cases that the federal offense of bank robbery is a crime of violence under § 924(c)(1)(A), (C). *United States v. Cosner*, ___Fed. Appx. ___, 2017 WL 2562331 (5th Cir. June 13, 2017); *United States v. Stephens*, ___Fed. Appx. ___, 2017 WL 1826099 (5th Cir. May 3, 2017)( *Johnson* does not bar a conviction under § 924(c) when federal bank robbery is the predicate crime of violence offense); United *States v. Brewer*, 848 F.3d 711, 714-16 (5th Cir. 2017); *United States v. Taylor*, Criminal No. H-13-101, Civil Action No. H-16-1699, 2016 WL 3346543 at *2 (S.D. Tex. June 16, 2016).

11

§ 2255(h)(2), because *Mathis* did not set forth a new rule of constitutional law that has been made retroactive to cases on collateral review): *United States v. Bermea*, 2017 WL 821787, at *2 (S.D.Tex. Mar. 2, 2017). Because *Mathis* does not apply on collateral review, Thomas has failed to state a viable claim, and his Motion for Leave to Amend should be denied.

Because Thomas filed the instant § 2255 motion after the effective date of the AEDPA, the provisions of that statute apply.[4] The Fifth Circuit affirmed Thomas's conviction on December 12, 2012. His conviction became final when the ninety-day period for filing a certiorari petition with the Supreme Court expired on March 12, 2013. See *Clay v. United States*, 537 U.S. 522, 527 (2003)(holding that "[f]inality attaches when this Court affirms a conviction on the merits on direct review or denied a petition for a writ of certiorari, or when the time for filing a certiorari petition expires"); *United States v. Franks*, 397 Fed. App'x 95 (5th Cir. Oct. 6, 2010)(holding that a conviction becomes final when the ninety-day period for seeking a writ of certiorari expires, even where the appeal has been dismissed for lack of prosecution). For purposes of § 2255(f)(1),

---

[4] On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") was enacted. Pursuant to § 2255(f), the one-year limitation period begins to run from the latest of:

    (1) the date on which the judgment of conviction becomes final;

    (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

    (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Thomas's conviction became final one year later or on or about March 12, 2014. Thomas filed the instant § 2255 motion on May 31, 2016. Thomas asserts that the § 2255 Motion is timely, pursuant to § 2255(f)(3), because the Supreme Court's decision in *Johnson* (made retroactive in *Welch*) is a newly asserted right, which began the limitations clock anew for his § 2255 motion. However, as discussed *supra*, *Johnson* and *Mathis* are inapplicable to Thomas's conviction, and none of the other alternative commencement dates for the one-year limitations period applies and he has not shown he is entitled to equitable tolling. Consequently, Thomas's § 2255 motion is untimely.

### III. Conclusion and Recommendation

Based on the foregoing, and the conclusions that Thomas has not stated a viable claim under *Johnson* or *Mathis* which renders his motion timely, the Magistrate Judge

RECOMMENDS that the Government's Motion to Dismiss (Document No.288) be GRANTED, that Movant's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 275), Motion to Amend § 2255 (Document No. 293) and Motion to Stay (Document No. 294) be DENIED, and this § 2255 proceeding be DISMISSED with prejudice on the merits.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. CIV. R. P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404(5th Cir. 1982)(en banc.). Moreover, absent plain error, failure to file objections within the fourteen-day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United*

*Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this \_\_\_5th\_\_\_ day of ~~July~~ October, 2017.

_____
FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE